IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 13-cv-02753-LTB

NOEL DAVID KNIGHT,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

_____

**ORDER**

_____

     Plaintiff Noel David Knight appeals the final decision of the Commissioner of Social

Security ("SSA") denying him disability benefits under Title II of the Social Security Act, 42

U.S.C. § 401, *et seq*.  I have considered the opening and response briefs [Docs. # 18, 22] and the

administrative record [Doc. # 12] ("AR").  Mr. Knight did not file a reply brief.  Oral argument

would not materially assist me in determining this appeal.

     Mr. Knight contends that the administrative law judge ("ALJ") erred in three respects in

determining his residual functional capacity at step four of SSA's sequential process for

evaluating disability.  He argues that the ALJ did not give adequate weight to the opinions of one

of his treating physicians.  He also contends that the ALJ did not properly evaluate the credibility

of his own statements regarding his pain and limitations.  Finally, he argues that the ALJ did not

account for his need to take frequent breaks.  As I explain below, these arguments are without

merit.  Accordingly, I **AFFIRM**.

## I.  Background

### A.  Procedural History

Mr. Knight filed his claim with SSA on August 1, 2011, alleging disability beginning December 18, 2009.  AR 24.  SSA denied his claim initially on October 19, 2011.  *Id.*  Mr. Knight requested a hearing.  *Id.*  The hearing took place on December 17, 2012, before an ALJ. *Id.*  On January 4, 2013, the ALJ denied Mr. Knight's claim, concluding that Mr. Knight was not disabled within the meaning of the Social Security Act.  AR 34.  On January 22, 2013, Mr. Knight requested that SSA's Appeals Council review the ALJ's decision.  AR 20.  On May 9, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of SSA. AR 4; *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).  By letter dated September 10, 2013, the Appeals Council extended the 60-day deadline for Mr. Knight to appeal the agency's final decision, allowing him 30 days from his receipt of the letter to do so.  AR 1.  SSA stated that it presumed Mr. Knight would receive the letter within five days.  *Id.*  On October 9, 2013, Mr. Knight timely filed the instant appeal.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

### B.  Facts

#### 1.  Education and Work History

Mr. Knight was born in 1957.  AR 207.  He has a high school education and completed a year of college.  AR 180-81.  He served in the United States Army and received a general discharge under honorable conditions.  AR 41-42.  He worked as a commercial parts professional at an auto parts store from December 2004 to December 2009.  AR 42, 193.  He testified that he was dismissed from that job because he "could not complete the functions of the

job anymore." AR 42. Prior to that, he worked as an auto service writer, a customer service representative, and a technical support supervisor. AR 42-44, 193.

### 2. Relevant Medical History

Mr. Knight alleges pain in his back, knees, and hips; hearing loss; diabetes mellitus; hearing loss; and gastroesophageal reflux disease ("GERD"). AR 180. It appears Mr. Knight received all relevant medical care through the U.S. Department of Veterans Affairs ("VA").

In October 2009, nurse practitioner Dianne Gipson noted chronic back pain, left toe numbness, and diabetes. AR 440. An abdominal x-ray later that month showed degenerative changes of the hips. AR 254. In June 2010, Mr. Knight complained to Ms. Gipson of throbbing in his right hip, leg, and knee, with a "pins and needles" sensation from the knee down. AR 406. He reported that his leg had gone out from under him the previous week. *Id.* On examination, Ms. Gipson observed that Mr. Knight favored his right leg when walking. AR 407. She noted negative straight leg raises bilaterally. *Id.*

In July 2010, Mr. Knight underwent a magnetic resonance imaging ("MRI") study of his lumbar spine. AR 252-53. Elliot Sandberg, M.D., assessed spondylosis. *Id.* He noted disc herniation at the L5-S1 and L4-L5 levels. *Id.* He noted "potential effacement" or "subtle effacement" of the S1, L5, and L4 nerve roots. *Id.* In addition, he noted that there was no narrowing of the spinal canal. *Id.*

In September 2010, VA physician Janet Sanchez, M.D., conducted a compensation examination of Mr. Knight to determine his eligibility for VA disability benefits based on "individual unemployability." AR 376-86. Mr. Knight reported pain associated with prolonged sitting, standing, and walking. *Id.* On examination, Dr. Sanchez noted that there was essentially

no objective evidence of muscle spasm, atrophy, or weakness. *Id.*. She noted that Mr. Knight had a slow, but normal, gait without foot drop or drag; no knee pain with range of motion testing; no joint effusion, swelling, or tenderness; and no knee or hip joint ankylosis or instability. *Id.* However, she noted limited range of motion in the lumbar spine and positive straight leg raising bilaterally. *Id.* Right hip x-rays showed mild joint space narrowing and moderate arthritis in the hip. AR 236. Knee x-rays showed minimal spurring bilaterally and mild patellar subluxation on the left knee. AR 236-38.

Dr. Sanchez assessed degenerative disc disease ("DDD"); degenerative joint disease ("DJD") in the knees; polyneuropathy in the arms and legs, likely due to diabetes rather than a lumbar spine condition; arthritis in the right hip; and GERD. AR 385. With respect to limitations on Mr. Knight's ability to work, Dr. Sanchez concluded that, while he was limited in his ability to sit, stand, or walk for "prolonged" periods, and in his ability to do any significant lifting or carrying, he was nonetheless able to perform "sedentary jobs which allow for frequent breaks to get up, stretch, and move around." *Id.* She noted that he can communicate orally, use a keyboard, and do jobs requiring telephone conversation. *Id.* Dr. Sanchez also concluded that Mr. Knight's GERD would not limit his employment options in any way. *Id.*

Also in September 2010, VA audiologist Jennifer Johnson, Au.D., evaluated Mr. Knight. AR 373-76. She assessed some hearing loss. *Id.* She indicated he would have minimal difficulty understanding speech in a quiet environment but would have increased difficulty in a noisy environment. *Id.* She concluded that, with amplification, Mr. Knight's hearing loss would not "significantly affect vocational potential or limit participation in most work activities." AR 376. Several months later, Mr. Knight was fitted with a hearing aid and reported good fit

4

and good sound quality.  AR 350.

In June 2011, the VA denied Mr. Knight an individual unemployability rating on the basis of Dr. Sanchez's and Dr. Johnson's examinations.  AR 231-35.  The VA discussed these doctors' findings and concluded that Mr. Knight was capable of gainful employment and, particularly, of performing "sedentary jobs which allow for frequent breaks to get up, stretch, and move around."  AR 234.  The VA noted that, with a hearing aid, Mr. Knight's hearing loss would not significantly affect his vocational potential or limit participation in most work activities.  AR 234-35.

In July 2011, Mr. Knight began seeing VA internal medicine doctor William Gramlich, M.D.  AR 712.  Dr. Gramlich conducted a diabetes examination and concluded that Mr. Knight's diabetes was poorly controlled.  AR 339.  In September 2011, however, it was noted that Mr. Knight's blood sugar levels had "greatly improved."  AR 314.  In November 2011, Dr. Gramlich observed that Mr. Knight had a normal gait; was in no distress; and had normal motor function, reflexes, and sensation.  AR 756.

On January 26, 2012, Dr. Gramlich completed a "Multiple Impairment Questionnaire," in which he provided opinions regarding Mr. Knight's symptoms and limitations dating back to December 2009.  AR 712-19.  Dr. Gramlich's opinions diverge significantly from those of Dr. Sanchez.  Dr. Gramlich wrote that Mr. Knight could only sit for "0-1" hours and "stand/walk" for "0-1" hours in an eight hour workday.  AR 714.  Further, he indicated that Mr. Knight would need to get up and move around for 10 minutes every half hour.  AR 714-15.  He also noted significant limitations in Mr. Knight's ability to repetitively reach, handle, finger, and lift; moderate limitations in his ability to grasp, turn, twist objects, and use his arms to reach; and

5

minimal limitations in his ability to use his fingers and hands for fine manipulations.
AR 715-16.  Dr. Gramlich indicated that pain or other symptoms would constantly interfere with
Mr. Knight's attention and concentration.  AR 717.  Dr. Gramlich noted that, in addition to
needing to stand up every half hour, Mr. Knight would need to take unscheduled 10 minute
breaks at unpredictable intervals every hour.  *Id.*  Dr. Gramlich estimated that Mr. Knight would
need to be absent from work more than three times per month.  AR 718.

Also on January 26, 2012, but in a different document, Dr. Gramlich noted that Mr.
Knight had normal strength in his arms and legs and that his gait was normal.  AR 748-50.  He
repeated this observation in May 2012.  AR 737.  That same month, Dr. Gramlich wrote a letter
"To Whom It May Concern" describing Mr. Knight's conditions.  AR 769-770.  Dr. Gramlich
noted that Mr. Knight has "significant [DJD] affecting the lumbosacral spine, the right hip, and
both knees."  *Id.*  These degenerative changes, he opined, rendered Mr. Knight "unable to do
full-time competitive work," even sedentary work.  *Id.*  Dr. Gramlich noted that Mr. Knight was
only able to walk 200 feet before needing to rest, stand for 15 to 20 minutes before needing to
sit, and sit for 15 to 20 minutes before needing to change positions.  *Id.*  However, Dr. Gramlich
noted that Mr. Knight has "no limitations with communication."  *Id.*

In January 2013, Dr. Gramlich completed a "Knee Impairment Questionnaire."
AR 872-76.  The ALJ did not consider this evidence, but it was submitted to the Appeals
Council.  Dr. Gramlich noted that Mr. Knight reported bilateral knee pain and weakness with
"some grinding sensation."  *Id.*  He diagnosed osteoarthritis based on 2010 x-rays of Mr.
Knight's knees that showed DJD.  *Id.*  He indicated that Mr. Knight was largely unable to flex or
extend his legs without pain; could only carry five to ten pounds; needed to use a cane; and

would be absent from work more than three times per month due to his impairment.  *Id.*  At

multiple points, Dr. Gramlich indicated that his assessment was based on a history provided by

Mr. Knight.  *Id.*

### 3.  Hearing Testimony

At the hearing on December 17, 2012, Mr. Knight testified that he cannot work because

of back problems that preclude him from sitting for more than 15 or 20 minutes; standing for

long periods "without the back muscles totally knotting up"; and walking "more than a couple of

hundred feet."  AR 44-45.  He related that he has severe back pain; stiffness and numbness in his

fingers; hearing loss; difficulty concentrating; and irritability.  AR 44-45, 57-58.  He claimed to

have problems holding things.  AR 47.  He stated that his diabetes requires testing three to four

times a day and has caused him to develop glaucoma and neuropathy of the lower legs and feet.

AR 46.

In regard to treatment, he claimed to use a cane "off and on" to aid with the pain in his

feet.  AR 46-47.  He said he takes pain medications to bring his pain "to a tolerable level,"

although they can cause him to "lose focus a little bit from time to time."  AR 48-49.  He also

testified that he has worn a back brace that "assists some" and has received injections in his hip

that provide 7 to 10 days of relief.  AR 50.  He acknowledged, however, that he has not received

injections in his back, has not undergone physical therapy, and has not used an electrical

stimulator such as a Transcutaneous Electrical Nerve Stimulation ("TENS") unit on his back.

AR 50-51.

Mr. Knight testified that he can sit for 20 to 30 minutes before needing to reposition

himself.  AR 52.  Further, he can stand for 20 to 30 minutes and walk for 20 to 25 minutes.  *Id.*

With respect to his daily activities, he testified that he has trouble getting his socks and shoes on. AR 53.  He noted that he does some cooking and sometimes takes out the trash.  AR 53-54.  He also mows his own lawn, although he says he takes breaks while doing so.  *Id.*  He pays bills online and spends 60 to 90 minutes on the computer each day.  AR 55.  He feeds his dog and walks to the mailbox and back.  AR 55-56.  Mr. Knight testified that doctors have not recommended back surgery because they would prefer to wait until he is older to do such surgery.  AR 50.

Vocational expert ("VE") Cindy Burnette testified at the hearing.  She testified that Mr. Knight's past relevant work included the jobs of customer service representative and technical support supervisor.  AR 59-60.  The ALJ posed a hypothetical to Ms. Burnette involving a person with a residual functional capacity limiting the person to sedentary work; occasional use of foot controls; frequent handling, fingering, and feeling with both hands; occasional climbing of ramps and stairs; no climbing of ladders and scaffolds; no working at unprotected heights; no use of vibrating tools; and a moderate noise setting such as that "in a typical office."  AR 60.  The ALJ also provided that the hypothetical individual would need to have the ability "to stand hourly for [5] to 10 minutes while remaining on task."  *Id.*  Ms. Burnette testified that the hypothetical individual could perform both the customer service representative and technical support supervisor jobs.  *Id.*

On cross-examination, Ms. Burnette testified that people in these positions could "sit or stand at will" and "[i]f they needed to take a quick break, they could."  AR 62-63.  She testified that, even if the individual needed to stand for 5 to 10 minutes every 20 to 30 minutes, rather than every hour, he could still do the technical support supervisor job, although the number of

jobs available would be eroded by 50%.  AR 64.  She stated that the customer service

representative job would be eliminated because of the amount of typing it requires.  AR 64-65.

Further, if the individual were to be off task 30% of the time or if he were to miss more than 3

days of work per month, all employment would be eliminated.  AR 65-66.

## II.  Legal Standards

### A.  SSA's Five-Step Process for Determining Whether a Claimant Is "Disabled"

A claimant is "disabled" under Title II of the Social Security Act if he is unable to

"engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A);

*see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  SSA has established the following

five-step sequential evaluation process for determining whether a claimant is disabled and thus

entitled to benefits.  20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful

activity."  If he is, benefits are denied and the inquiry stops.  *Id.* § 404.1520(b).  At step two,

SSA asks whether the claimant has a "severe impairment"—that is, an impairment or

combination of impairments that "significantly limits [his] physical or mental ability to do basic

work activities."  *Id.* § 404.1520(c).  If he does not, benefits are denied and the inquiry stops.  If

he does, SSA moves on to step three, where it determines whether the claimant's impairment(s)

"meet or equal" one of the "listed impairments"—impairments so severe that SSA has

determined that a claimant who has them is conclusively disabled without regard to the

claimant's age, education, or work experience.  *Id.* § 404.1520(d).  If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC"), *i.e.,* what he is still able to do despite his impairments, and asks whether the claimant can do any of his "past relevant work" given that RFC. *Id.* § 404.1520(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows him to do other work in the national economy in view of his age, education, and work experience. *Id.* § 404.1520(g). At this step, SSA's "grid rules" may mandate a finding of disabled or not disabled without further analysis based on the claimant's age, education, and work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2. In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal*, 331 F.3d at 760.

**B.  Standard for Reviewing SSA's Decision**

My review is limited to determining whether SSA applied the correct legal standards and whether its decision is supported by substantial evidence in the record. *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000). With regard to the law, reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon [this] court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)).  The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  I may not re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).

### III.  The ALJ's Decision

The ALJ followed the five-step analysis outlined above.  At step one, the ALJ found that Mr. Knight has not engaged in substantial gainful activity since the alleged onset date of his conditions, December 18, 2009.  AR 26.  At step two, the ALJ found the following severe impairments: "degenerative lumbar disc disease, degenerative joint disease in the bilateral knees, arthritis in the right hip, diabetes mellitus type II, and sensorineural hearing loss."  *Id.*  At step three, the ALJ concluded that Mr. Knight did not meet or equal any of the listed impairments. AR 26-27.  At step four, the ALJ assessed Mr. Knight's RFC.  The ALJ assessed an RFC with restrictions consistent with the hypothetical posed to the VE at the hearing: sedentary work, as defined in 20 C.F.R. § 404.1567(a); frequent handling, fingering, and feeling; occasional use of foot controls; occasional climbing of ramps and stars; no climbing ladders or scaffolds; no working at unprotected heights; and moderate exposure to noise.  AR 27.  The ALJ determined that this RFC permitted Mr. Knight to perform his past relevant work as a customer service representative and technical support supervisor.  AR 32.  Based on this conclusion, the ALJ determined that Mr. Knight was not disabled.  AR 32-33.  The ALJ did not proceed to step five.

## IV.  Analysis

**A.  The ALJ's Discounting of Dr. Gramlich's Opinions**

Mr. Knight argues that the ALJ gave insufficient weight to Dr. Gramlich's opinions.  A two-part inquiry determines the weight to be given the opinion of a treating physician.  The ALJ first determines whether the opinion is "well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  If so, the opinion is accorded "controlling weight."  *Id.*  If not, the ALJ determines how much weight, if any, to give the opinion by considering the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331 (citation omitted).  The ALJ must make findings that are sufficiently specific for subsequent reviewers to determine the weight the ALJ gave to the opinion and the reason for that weight.  *Id.*

Dr. Gramlich concluded that Mr. Knight was precluded from sitting or "standing/walking" for more than "0-1" hour of each eight-hour day of a five-day workweek; that he can only stand for 15 to 20 minutes before needing to sit; that he can only walk 200 feet before needing to stop and rest; that he can only sit for 15 to 20 minutes before needing to change positions; that he must get up and move around every half hour for 10 minutes; that he

must take unscheduled breaks every hour for 10 minutes; that he uses a cane for all ambulation; and that he would miss more than three days of work per month due to his condition.  AR 712-19, 769.  Dr. Gramlich ultimately concluded that Mr. Knight has been "unable to do full-time competitive work" since December 2009 and that "even sedentary work would be difficult to impossible."  AR 769.  In support of his conclusions, Dr. Gramlich relied upon the July 2010 spinal MRI, which he said showed herniated discs at the L3-4, L4-5, and L5-S1 levels as well as "nerve root involvement"; x-rays of the right hip showing "evidence of degenerative change and hip impingement"; and x-rays of the bilateral knees showing "evidence of bilateral arthritic change."  AR 713, 769.

The ALJ determined that Dr. Gramlich's opinions were entitled to "little weight."  AR 32.  The ALJ explained that Dr. Gramlich's "assessment reflecting severe limitations is not consistent with the record as a whole reflecting mild to moderate objective findings," particularly the "multiple detailed evaluations and assessments by the VA doctors," which yielded findings of "mild to moderate degenerative changes in the spine and hip, normal muscle strength and no evidence of atrophy."  AR 31-32.  As the ALJ noted, the July 2010 MRI that Dr. Gramlich cited showed no distinct evidence of nerve impingement—only "potential" or "subtle" effacement of nerve roots—and no evidence of canal stenosis.  AR 252.  The right hip x-rays he referenced showed only "moderate" arthritic changes.  AR 236-47.  The knee x-rays he referenced showed "minimal" spurring bilaterally and "mild" patellar subluxation of the left knee.  *Id.*  In addition, the ALJ noted that Dr. Gramlich's opinions are inconsistent with the physical examination performed by Dr. Sanchez in September 2010, which the ALJ observed was the "most detailed physical examination in the record."  AR 30.  While Dr. Sanchez found limited range of motion

in the lumbar spine and positive straight leg raising bilaterally, she found no evidence of muscle spasm, atrophy, or weakness; no joint effusion, swelling, or tenderness; no knee or hip joint ankylosis or instability; no knee pain with range of motion testing; and a normal, albeit slow, gait, with no foot drop or drag.  AR 376-86.  Further, the ALJ noted that the VA found Mr. Knight capable of performing sedentary work (with the option to alternate sitting, standing and walking) based on these imaging and physical examination findings.  AR 31 (citing AR 231-35).

The ALJ cited additional reasons for discounting Dr. Gramlich's opinions.  The ALJ noted that Dr. Gramlich was a primary care doctor and had only treated Mr. Knight for six to seven months at the time he completed the questionnaire in which he expressed most of the above-noted opinions.  AR 32.  The ALJ also noted that Dr. Gramlich's conclusions were inconsistent with Mr. Knight's activities of daily living.  *Id.*  At the hearing, Mr. Knight testified that he feeds his dog each day; walks to the mailbox and back; uses his computer for 60 to 90 minutes; prepares simple meals; and uses the dishwasher.  AR 52-56.  He also testified that he goes to the grocery store once a week and spends 20 to 25 minutes walking around the store; mows his own lawn for 60 to 90 minutes, inclusive of breaks; and takes out the trash every 3 to 4 days.  *Id.*  At the September 2010 physical examination with Dr. Sanchez, Mr. Knight reported using the staircases in his house six times per day.  AR 537.

I conclude that the foregoing is substantial evidence supporting the ALJ's decision to give Dr. Gramlich's opinions little weight, and that the ALJ did not err in doing so.  Dr. Gramlich's "extreme limitations," as the ALJ put it, AR 32, are simply not supported by the objective imaging findings, the physical examination, or the other record evidence cited by the parties.  Therefore, considering the first part of the analysis discussed above, it was appropriate

14

for the ALJ to decline to give Dr. Gramlich's opinion controlling weight. *Krauser*, 638 F.3d at 1330.  In regard to the second part of the analysis, the ALJ amply explained, with reference to the factors enumerated above, her reasons not only for disregarding the opinion, but for giving it little weight.  For example, the ALJ specifically referenced the length of the treatment relationship, the fact that Dr. Gramlich is not a specialist, and the fact that his opinions are inconsistent with other evidence in the record, particularly Mr. Knight's activities of daily living.  AR 31-32.  In addition, the ALJ considered the VA's determination that Mr. Knight was capable of gainful employment and, in particular, sedentary work.  *See Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (noting that "[a]lthough another agency's determination of disability is not binding on the Social Security Administration, it is evidence that the ALJ must consider") (citing 20 C.F.R. § 416.904).  Therefore, the ALJ's analysis satisfies the second part of the analysis as well.  *See Krauser,* 638 F.3d at 1331.

I am not persuaded by Mr. Knight's argument that the ALJ improperly relied upon her own medical judgment in discounting Dr. Gramlich's opinion.  *See Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987) ("While the ALJ is authorized to make a final decision concerning disability, he can not interpose his own 'medical expertise' over that of a physician.").  For example, in support of her conclusion that the "medical evidence as a whole shows mild to moderate findings," the ALJ referenced medical records in which VA physicians used those and similar terms.  *See, e.g.,* AR 29 (ALJ citing to radiology report in which radiologist notes "moderate arthritic changes" in right hip).  Therefore, the ALJ relied not upon her own medical judgment but upon that of the physicians who authored the records.  I also am not persuaded by Mr. Knight's argument that the ALJ improperly relied upon Mr. Knight's daily activities in

determining the weight to give Dr. Gramlich's opinions.  While it is true that "evidence that a claimant engages in limited activities, such as short-term work or driving, does not establish that the claimant can engage in light or sedentary work activity," such evidence "may be considered, along with other evidence, in determining whether a person is entitled to disability benefits." *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).  Here, the ALJ relied upon Mr. Knight's daily activities not to determine whether he could perform sedentary work, and not in isolation, but rather, to determine the credibility of a medical opinion in conjunction with other evidence in the record.  The ALJ did not err in doing so.

## B.  The ALJ's Discounting of Mr. Knight's Complaints

Mr. Knight also contests the ALJ's evaluation of the credibility of Mr. Knight's statements regarding his pain and limitations.  "To determine the credibility of pain testimony, the ALJ should consider such factors as: the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Branum v. Barnhart*, 385 F.3d 1268, 1273-74 (10th Cir. 2004).  An "ALJ's credibility findings warrant particular deference" and should not be upset "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility." *White*, 287 F.3d at 909-10.  A "formalistic factor-by-factor recitation of the evidence" is unnecessary. *Id.* (citation omitted).  Here, the ALJ concluded that, while Mr. Knight's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, his

statements about the intensity, persistence, and limiting effects of his symptoms were not fully

persuasive.  AR 28-31.

The ALJ focused on discrepancies between Mr. Knight's claimed limitations and various

other evidence in the record, including Mr. Knight's reported activities of daily living; the

imaging and physical examination findings; the VA's conclusions regarding his level of

disability; the treatment he obtained for his conditions; and unemployment benefits he received

after his alleged onset date.  *See* 20 C.F.R. § 404.1529(c)(4) (agency considers "the extent to

which there are any conflicts between your statements and the rest of the evidence"); SSR 96-7p,

1996 WL 374186, at *5 (July 2, 1996) ("One strong indication of the credibility of an

individual's statements is their consistency, both internally and with other information in the

case record.").  For example, the ALJ noted that the mild to moderate x-ray, MRI, and physical

examination findings discussed above, *see supra* Sec. IV.A., were not consistent with Mr.

Knight's allegations of severe limitation.  *See Gossett*, 862 F.2d at 807 (upholding credibility

determination where claimant demonstrated a satisfactory range of motion for the joints in

question despite his complaints of pain).

The ALJ also noted that, based on these imaging and physical examination findings, the

VA found Mr. Knight capable of performing sedentary work with the option to alternate sitting,

standing, and walking.  AR 31 (citing AR 231-35).  The ALJ noted still other discrepancies.  She

noted that, while Mr. Knight told VA doctors that he missed only four days of work in the span

of a year, he testified at the hearing to missing work far more frequently during the same period.

AR 29, 377; AR 45 (Mr. Knight testifying to missing one to two days of work per month

beginning in 2009).  In addition, the ALJ noted that, while Mr. Knight claimed to use a cane, he

did not have one with him at his appointment with Dr. Sanchez.  AR 28, 377; *see Wilson v. Astrue,* 602 F.3d 1136, 1146 (10th Cir. 2010) (noting that claimant's testimony that she was limited to sitting for no longer than 30 minutes was inconsistent with her statement that she could not drive for longer than 90 minutes and "undermines [the claimant's] claims of a disabling level of pain, no matter the source") (emphasis removed); *Luna v. Bowen*, 834 F.2d 161, 165-66 (10th Cir. 1987) (ALJ may properly consider whether claimant regularly uses crutches or a cane in evaluating claimant's credibility).

Mr. Knight argues that the ALJ improperly relied upon Mr. Knight's activities of daily living in assessing his credibility, noting that limited daily activities do not establish an ability to work.  As noted above, Mr. Knight alleged he was unable to sit, stand, or walk for more than approximately 20 minutes, yet testified to mowing the lawn, using the computer for 60 to 90 minutes each day, and shopping for groceries weekly.  AR 29, 52, 54-55.  As discussed above in the context of Dr. Gramlich's opinions, while it is improper for an ALJ to rely exclusively on such evidence as proof of a claimant's ability to work on a full-time basis, it is well within an ALJ's discretion to rely on such evidence, alongside other evidence in the record, to determine a claimant's credibility.  *Gossett*, 862 F.2d at 807; *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (in determining credibility of pain testimony, the "nature of daily activities," among other factors, may be considered); *Klein v. Colvin*, 25 F. Supp. 3d 1338, 1343 (D. Colo. 2014) ("Although activities of daily living do not necessarily translate to the ability to perform work-related activities on a sustained basis, they do bear on a plaintiff's credibility to the extent that the level of activity is in fact inconsistent with the claimed limitations.") (citations and quotations omitted).

Mr. Knight also argues that the ALJ erred in relying on evidence regarding treatment Mr. Knight has received and not received to discount his credibility.  The ALJ noted that the record did not reflect treatment consistent with Mr. Knight's alleged debilitating pain.  AR 28.  For example, the ALJ noted that Mr. Knight had not tried a TENS unit and that doctors had not suggested surgery.  *Id.*  The ALJ properly considered such evidence in evaluating the credibility of Mr. Knight's claims of pain and limitation.  *See* 20 C.F.R. § 404.1529(c)(3)(v) (agency considers treatments received in evaluating a claimant's credibility); *White*, 287 F.3d at 909-10 (noting that claimant's admission that medication relieved some of her pain supported ALJ's finding that impairments were not as disabling as claimed"); *Wall v. Astrue,* 561 F.3d 1048, 1069 (10th Cir. 2009) (noting that claimant "received remarkably conservative treatments for her pain").

Finally, Mr. Knight argues that the ALJ improperly considered the fact that, after his alleged onset date, Mr. Knight received unemployment benefits, thereby holding himself out as ready and able to work.  AR 29, 167-68; Colo. Rev. Stat. § 8-73-107 (an unemployed individual is eligible to receive benefits if he is able to work and available for work); 42 U.S.C. § 423(d)(2)(A) (a Social Security disability claimant is not disabled unless "he is not only unable to do his previous work but [also] cannot . . . engage in any other kind of substantial gainful work").  Mr. Knight points out that receipt of unemployment benefits does not preclude receipt of Social Security disability benefits.  While this may be true, it is clear that an ALJ may consider receipt of unemployment benefits in evaluating the credibility of a claimant's statements.  *See Lately v. Colvin,* 560 F. App'x 751, 755 (10th Cir. 2014) (ALJ properly found claimant's testimony not fully credible based on claimant's "collection of unemployment

19

benefits, which required her to attest that she was ready, willing, and able to work").

## C.  The ALJ's RFC Determination

Mr. Knight argues that the ALJ's RFC assessment fails to account for Dr. Sanchez's opinion that Mr. Knight requires "frequent breaks to get up, stretch, and move around."  AR 385. The ALJ found that Mr. Knight is capable of performing "sedentary work as defined in 20 C.F.R. § 404.1567(a)," although she did not make specific reference to breaks in her decision. AR 27 (punctuation added).  Agency regulations define sedentary work as work which involves sitting, with occasional walking or standing.  20 C.F.R. § 404.1567(a).  In addition, agency policy provides that sedentary work entails a morning break, a lunch period, and an afternoon break at approximately two-hour intervals.  SSR 96-9p, 1996 WL 374185 (July 2, 1996). Therefore, by her reference to sedentary work, the ALJ incorporated reasonably frequent breaks into her RFC assessment.

More importantly, the VE provided specific testimony as to break frequency in regard to the two jobs the ALJ determined Mr. Knight could perform: customer support representative and technical support supervisor.  *See* AR 62-63 (VE testifying that "[t]hese jobs are going to be pretty flexible; so if they need to stand and continue to perform their job, they're able to do that"); *id.* (VE testifying regarding her experience observing individuals working in these positions and noting that "people could sit or stand at will" and that "[i]f they needed to take a quick break, they could").  Mr. Knight has not challenged the VE's testimony or findings. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those of her contentions that have been adequately briefed for our review.").  Accordingly, I conclude that the ALJ properly accounted for Mr. Knight's need to take frequent breaks at work

in determining his RFC.

### V.  Conclusion

For the foregoing reasons, SSA's decision is **AFFIRMED**.


DATED:  May   26  , 2015, at Denver, Colorado.

BY THE COURT:


   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE
